# 14-0036-cv(L)
## 14-0037 (XAP)

### United States Court of Appeals
### For the Second Circuit

WILLIAM NOJAY, THOMAS GALVIN, ROGER HORVATH, BATAVIA MARINE & SPORTING SUPPLY, NEW YORK STATE RIFLE AND PISTOL ASSOCIATION, INC., WESTCHESTER COUNTY FIREARMS OWNERS ASSOCIATION, INC., SPORTSMEN'S ASSOCIATION FOR FIREARMS EDUCATION, INC., NEW YORK STATE AMATEUR TRAPSHOOTING ASSOCIATION, INC., BEDELL CUSTOM, BEIKIRCH AMMUNITION CORPORATION, BLUELINE TACTICAL & POLICE SUPPLY, LLC,

*Plaintiff-Appellants-Cross-Appellees,*

v.

ANDREW M. CUOMO, Governor of the State of New York, ERIC T. SCHNEIDERMAN, Attorney General of the State of New York, JOSEPH A. D'AMICO, Superintendent of the New York State Police,

*Defendants-Appellees-Cross-Appellants,*

GERALD J. GILL, Chief of Police for the Town of Lancaster, New York, LAWRENCE FRIEDMAN,

*Defendants-Appellees,*

FRANK A. SEDITA, III, District Attorney for Erie County,

*Defendant.*

_____

On Appeal From The United States District Court
For The Western District Of New York

## BRIEF FOR THE CITY OF NEW YORK, AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES-CROSS-APPELLANTS

ZACHARY W. CARTER
Corporation Counsel of the City of New York
Attorney for *Amicus Curiae*
100 Church Street
New York, New York 10007
(212) 356-0821 or 2500

RICHARD DEARING,
SUSAN PAULSON,
    *of Counsel.*

August 5, 2014

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... ii

INTEREST OF THE *AMICUS CURIAE* .................................................... 1

BACKGROUND .......................................................................................... 4

    A. The City's Early Adoption of an Assault-Weapon Ban ............................ 4

    B. The Now-Expired Federal Assault-Weapon Ban ....................................... 7

    C. The State Legislature's Enactment of the SAFE Act ................................. 8

ARGUMENT ............................................................................................... 9

    THE SAFE ACT IS CONSTITUTIONAL ..................................................... 9

        A. Civilian Possession of Modern Military-Style
        Weapon Is Not Protected By the Second Amendment ................... 9

        B. If the Second Amendment Were Triggered Here,
        the SAFE Act Would Meet Any Appropriate Level
        of Scrutiny ..................................................................................... 11

            1. Because the SAFE Act leaves open ample avenues for
            gun possession, it is subject at most to rational basis
            scrutiny ..................................................................................... 11

            2. The SAFE Act would satisfy heightened scrutiny if
            it applied. .................................................................................. 13

CONCLUSION ............................................................................................ 17

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                    **<u>Pages</u>**


*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................... 9-10, 12

*McDonald v. City of New York*, 130 S. Ct. 3020 (2010) .......................................12

*Richmond Boro Gun Club, Inc. v. City of N.Y.*, 97 F.3d 681 (2d Cir. 1996).............6

*United States v. DeCastro*, 682 F.3d 160 (2d Cir. 2012).......................................11


**<u>Statutes and Session Laws</u>**

  **<u>Federal</u>**

Violent Crime Control and Law Enforcement Act of 1994,
  Pub. L. No. 103-322, tit. XI, subtit. A, 108 Stat. 1796 (1994) ...............................7

  **<u>State</u>**

Ch. 189, 2000 N.Y. Law 2788 ...................................................................................8

Penal Law
    § 265.00..........................................................................................................8
    § 265.37..........................................................................................................9

  **<u>City</u>**

Local Law 78 of 1991 ............................................................................................ 5-6

Local Law 8 of 2005 ..................................................................................................6

N.Y. City Administrative Code
    § 10-301 ..........................................................................................................6
    § 10-303.1 .....................................................................................................5, 6

**TABLE OF AUTHORITIES (cont'd)**

**Miscellaneous Authorities**                                          **Pages**

George James, *New York Killings Set a Record,*
*While Other Crimes Fell in 1990*, New York Times (Apr. 23, 1991)....................4

N.Y. City Police Dep't, *Annual Firearms Discharge Report – 2011* ......................2

NYLS City Council Bill Jacket for Local Law 78 of 1991 ............................ *passim*

NYLS City Council Bill Jacket for Local Law 8 of 2005 .................................. 6, 15

## INTEREST OF THE AMICUS CURIAE

The City of New York files this brief as *amicus curiae* in support of the state defendants' arguments for upholding the New York Secure Ammunition and Firearms Enforcement Act of 2013, as amended, commonly known as the "SAFE Act."[1] The SAFE Act's strengthening of New York State's existing restrictions on civilian possession of military-style assault weapons and high-capacity ammunition magazines, and the Act's restrictions on loading more than seven rounds of ammunition into a magazine, will enhance the safety and security of all New Yorkers and greatly assist the officers of the New York City Police Department (NYPD) in their continuing efforts to keep our City safe and secure.

The City of New York respects the Second Amendment rights of individuals, including the right of qualified persons to possess firearms for self-defense in the home and for target practice or recreational uses in appropriate locations and under appropriate precautions. Those rights may be fully honored, however, without opening the door to civilian possession of military-style weapons, such as assault weapons or semiautomatic weapons with high-capacity ammunition magazines. Permitting civilians to possess such weaponry would

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a), *amicus* certifies that it has obtained the consent of all parties to the filing of this brief. Pursuant to Local Rule 29.1, *amicus* certifies that no counsel for a party authored this brief in whole or in part and no counsel or party, other than the City of New York, made a monetary contribution to fund the preparation or submission of the brief.

enhance the threats to our populace from gang warfare and mass shootings, among other dangers, and would place our police officers at heightened risk in the fluid and highly perilous situations to which they must respond.

The NYPD—the nation's largest municipal police force, comprising nearly 35,000 officers—is responsible for maintaining public order and safety in the City of New York, home to more than eight million residents and host to tens of millions of commuters and visitors annually. Policing this densely populated urban environment presents an enormous challenge: in 2011, for example, the officers of the NYPD engaged in over twenty million civilian contacts, and received about a quarter of a million radio assignments involving weapons and made almost 30,000 weapons-related arrests.[2]

Assault weapons and large-capacity magazines pose a substantial threat to the safety of the public and of police officers, especially in densely populated urban environments such as New York City. The factual record shows that assault weapons, due to their capacity for rapid discharge of large numbers of rounds of ammunitions, present an increased potential for violence both to police officers and innocent bystanders. Attacks with assault weapons and other semiautomatic weapons equipped with large-capacity magazines result in more shots fired, more

---

[2]  N.Y. City Police Dep't, *Annual Firearms Discharge Report – 2011*, at xiii, *available at* http://www.nyc.gov/html/nypd/downloads/pdf/analysis_and_planning/nypd_annual_firearms_discharge_report_2011.pdf (visited Aug. 2, 2014).

persons hit, and more wounds inflicted per victim than do attacks with other firearms (*see* Joint Appendix ["A."] 452).

For precisely these reasons, in 1991, the City of New York, with the backing of the NYPD and its then-Commissioner, became an early adopter of strong restrictions on assault weapons and high-capacity magazines. Such local restrictions are critical but not enough by themselves. It is very difficult to stop people from crossing city lines with weapons that are prohibited inside of the City but permitted outside of it. Accordingly, when enacting the City's restrictions, city officials called for the federal and state governments to follow suit.

Since that time, a federal assault-weapons law has been enacted and then allowed to expire. In 2000, the New York State Legislature enacted restrictions on assault weapons and high-capacity magazines that mirrored the now-sunset federal law, but was weaker than the City's restrictions. With the enactment of the SAFE Act in 2013, the Legislature brought the state-law restrictions regarding military-style weapons closer to the City's longstanding restrictions. The City views the SAFE Act's strengthening of state law as an important tool in protecting the safety of the public and of the NYPD's officers in New York City.

The City thus supports the arguments of the state defendants in this appeal, both because of the City's strong interest in preserving its own pioneering assault-

weapons restrictions, and because the SAFE Act plays an important role in enhancing the safety and security of the public in New York City.

## BACKGROUND

### A. The City's Early Adoption of an Assault-Weapons Ban

In 1991, New York City was facing historically high rates of serious violent crime—the City had seen a record 2,245 homicides in the prior year,[3] with more than 1500 of those killings resulting from firearms.[4] The Mayor responded with a proposed package of state and local gun-control reforms.[5] One such reform was a proposed citywide ban on "assault weapons"—then an emerging category of dangerous firearms comprising semiautomatic versions of military-style assault weapons.

The proposed assault-weapons ban received strong backing from the City's law enforcement community. The NYPD urged the City Council to "place New York City in the forefront of a national movement to limit the awesome illegal

---

[3] *See* George James, New York Killings Set a Record, While Other Crimes Fell in 1990, *New York Times* (Apr. 23, 1991), *available at* http://www.nytimes.com/1991/04/23/nyregion/new-york-killings-set-a-record-while-other-crimes-fell-in-1990.html (visited Aug. 5, 2014)

[4] Ltr. from Mayor David N. Dinkins to the Members of the New York City Council, dated June 24, 1991, *reprinted in* NYLS City Council Bill Jacket for Local Law 78 of 1991.

[5] *See* Memorandum from Frank T.W. New to Mayor David N. Dinkins, dated June 24, 1991, Ltr. from Mayor David N. Dinkins to Councilmember Mary Pinkett, dated July 25, 1991, *as reprinted in*, NYLS City Council Bill Jacket for Local Law 78 of 1991.

firepower on our streets."[6] Police Commissioner Lee Brown decried civilian possession of "weapons of war that are incompatible with a civilized society," and stressed that "the public's safety requires no less than a total ban on assault rifles in New York City."[7] The City's Special Narcotics Prosecutor echoed the call to outlaw what he described as "people-killing machines," saying that a ban on assault weapons was "desperately needed" because such weapons had "become particularly prevalent among criminal elements such as drug dealers and members of street gangs and organized crime operations, who without any regard to the lives of innocent by-standers, [we]re using them to settle turf and drug-dealing disputes."[8]

In response to these serious dangers, in July 1991, the City Council passed and the Mayor of New York signed Local Law 78 of 1991, which was then the toughest assault-weapons ban in the country. As enacted in 1991, and as it continues to exist today, the City's ban outlaws the possession or transfer of assault weapons, subject to limited exceptions. N.Y. City Admin. Code § 10-303.1. The statute defines "assault weapons" to include any semiautomatic centerfire or

---

[6] Letter from Police Commissioner Lee P. Brown to Chairman, Public Safety Committee, dated March 25, 1991, NYLS City Council Bill Jacket for Local Law 78 of 1991.

[7] *Id.*; *see also* August 16, 1991 Public Hearing on Local Laws, at 13-14, NYLS City Council Bill Jacket for Local Law 78 of 1991 (Brown test.).

[8] Letter from Special Narcotics Prosecutor Sterling Johnson, Jr. to City Council President, dated July 26, 1991, NYLS City Council Bill Jacket for Local Law 78 of 1991.

rimfire rifle or semiautomatic shotgun with at least one of the following military-style features: (1) a folding or telescoping stock or no stock; (2) a pistol grip that protrudes conspicuously below the action of the weapon; (3) a bayonet mount; (4) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; (5) a barrel shroud; (6) a grenade launcher; or (7) modifications of the above features or other features determined by rule of the Police Commissioner to be particularly suitable for military and not sporting use. Admin. Code § 10-301(16). These provisions have been upheld by this Court over a vagueness challenge. *See Richmond Boro Gun Club, Inc. v. City of N.Y.*, 97 F.3d 681 (2d Cir. 1996), *aff'g*, 896 F. Supp. 276 (E.D.N.Y. 1995).

The City's 1991 law also set capacity limitations for magazines or other ammunition-feeding devices, capping capacity at five rounds as to rifles and shotguns, and at seventeen round magazines capable as to handguns.[9] The City's law does not grandfather weapons or manufactured possessed or manufactured before its enactment.[10]

---

[9] In addition, the law authorizes the imposition of criminal penalties up to one year in jail and up to $5,000 in fines and civil penalties of up to $10,000, which in 2005 were increased to $25,000. Admin. Code § 10-303.1(b), (c).

[10] In 2005, in response to the expiration of the federal ban on assault weapons, see *infra*, at 8, the City strengthened its own assault weapons ban by, among other things, increasing the penalties for violating the law. *See* Local Law 8 of 2005; *see also* NYLS City Council Bill Jacket for Local Law 8 of 2005

When the City enacted its restrictions on assault weapons and high-capacity magazines in 1991, the City Council expressed strong hopes that the enactment would send a signal to other jurisdictions, particularly New York State, to pass similar legislation.[11]

## B. The Now-Expired Federal Assault-Weapons Ban

The City Council's hopes began to be realized in 1994, when the federal government enacted nationwide restrictions on semiautomatic assault weapons and high-capacity magazines, after years of study and extensive hearings. Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, tit. XI, subtit. A, 108 Stat. 1796 (1994). The federal statute prohibited eighteen specifically identified firearms, as well as certain other semiautomatic firearms with at least two military-style features that were enumerated in a list similar to the one used in the City's assault-weapons law. *Id.* § 110102(b), 108 Stat. 1997-98. The federal law also prohibited magazines with the capacity to hold more than ten rounds of ammunition. *Id.* § 110103(b), 108 Stat. 1998-99. The federal statute grandfathered any weapons and magazines that had been lawfully possessed before the date of its enactment, as well as any magazines that were manufactured before the enactment date. *Id.* §§ 110102(a), 110103(a), 108 Stat. 1997, 1999-2010.

---

[11] August 16, 1991 Public Hearing on Local Laws, at 10, NYLS City Council Bill Jacket for Local Law 78 of 1991.

The federal restrictions on assault weapons and high-capacity magazines expired in 2004 under the enactment's sunset provision, *see Id.* §§ 110105(2), 108 Stat. 2000, and they have not been re-enacted.

## C. The State Legislature's Enactment of the SAFE Act

In 2000, New York State enacted its own restrictions on assault weapons, which essentially mirrored the federal assault-weapons statute, but without including any sunset provision. *See* Ch. 189, 2000 N.Y. Laws 2788.

In 2013, after several high-profile mass shooting events, the New York Legislature enacted to SAFE Act to strengthen the state law and eliminate gaps and ambiguities in the former statute. *See* Br. for the State Defs. as Appellees and as Cross-Appellants ("State Br.") at 10-16 (discussing the amendments). First, whereas the former statute had banned certain semiautomatic firearms with at least two military-style features, the SAFE Act aimed to reduce circumvention of the restrictions by adopting a clearer one-feature test, as the City's assault-weapons ban had long used. Penal Law § 265.00(22); *see also* A. 664, 673, 681. Second, the SAFE Act eliminated the former statute's grandfathering rule for high-capacity magazines manufactured before its effective date, which law enforcement officials had found difficult to apply.[12] Penal Law § 265.00(23); *see also* A. 669, 677, 685.

---

[12] The NYPD's License Division confirms that, in its experience, the former New York statute's grandfathering rule based on a magazine's date of manufacture was quite difficult to apply,

Third, the Act added a "load limit" prohibiting the possession of a magazine loaded with more than seven rounds of ammunition. Penal Law § 265.37.[13]

## ARGUMENT

## THE SAFE ACT IS CONSTITUTIONAL

The City of New York adopts and fully supports the arguments of the state defendants regarding the constitutionality of the provisions of the SAFE Act at issue under the Second Amendment and the Due Process Clause's vagueness doctrine. The City here seeks to highlight a few important points in the Second Amendment analysis.

### A. Civilian Possession of Modern Military-Style Weapons Is Not Protected By the Second Amendment.

As a threshold matter, the SAFE Act comports with the Second Amendment because laws restricting civilian possession of modern military-style weaponry fall outside of the Amendment's scope. In *District of Columbia v. Heller*, the Supreme Court made clear that the Second Amendment does not create "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. 570, 626 (2008). Rather, the Amendment protects "the sorts of weapons" that were "'in common use at the time'" of the Framing, *id.* at 627

---

because the actual date of manufacture often cannot be independently determined by law enforcement officials.

(quoting *U.S. v. Miller*, 307 U.S. 174, 179 (1939)), and does not extend to "the carrying of dangerous and unusual weapons," *id.* at 627 (quotation marks omitted). The Court has thus confirmed that the Second Amendment safeguards an individual's right to possess "small arms" analogous to those weapons in common use in the era of the Framing, and does not create any right to "possess weapons that are most useful in military service—M-16 rifles and the like." *Id.*

The state defendants have well demonstrated that the basic objective and effect of bans on assault weapons and high-capacity magazines are to restrict civilians' access to and use of military-style firearms. See State Br. at 23-29. The text and history of the City's analogous law provide further support on these points. In enacting the citywide ban on assault weapons and high-capacity magazines, the City Council made express findings that "semiautomatic 'assault weapons' are generally recognized as particularly suitable for military and not sporting purposes." Local Law 78 of 1991, § 1. The Council likewise found that high-capacity magazines "which are capable of holding more than five rounds of ammunition and which are capable of being used in assault weapons are particularly suitable for military and not sporting purposes." *Id.*

---

[13] By limiting the effective capacity of magazines to seven rounds of ammunition, the SAFE Act brought state law closer in practical effect to the provisions of the City's law as to rifles and shotguns, since local law restricts magazine capacity to five rounds for such weapons.

Similarly, the then-Police Commissioner described the covered weapons as "weapons of war," and the City's Special Narcotics Prosecutor called them "people-killing machines," noting their use by drug gangs and organized crime operations. The Second Amendment provides no protection for civilian possession of such military-style weaponry.

**B. If the Second Amendment Were Triggered Here, the SAFE Act Would Meet Any Appropriate Level of Scrutiny.**

**1. Because the SAFE Act leaves open ample avenues for gun possession, it is subject at most to rational basis scrutiny.**

To the extent that the Second Amendment is even implicated by the public-safety protections of the SAFE Act, the statute is subject to rational-basis review, which it easily satisfies. In *United States v. DeCastro*, this Court stressed that heightened scrutiny under the Second Amendment does not apply to every "marginal, incremental, or even appreciable restraint on the right to keep and bear arms." 682 F.3d 160, 166 (2d Cir. 2012). To the contrary, "heightened scrutiny is appropriate only as to those regulations that substantially burden the Second Amendment." *Id.* at 164. And "a law that regulates the availability of firearms is not a substantial burden if adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense." *Id.* at 168.

As the state defendants have shown (Br. at 35-42), the SAFE Act leaves open numerous adequate legal avenues for the possession of firearms for self-

defense or other lawful purposes, so long as individuals do not possess prohibited military-style assault weapons or violate the statute's magazine-capacity and load limits. The SAFE Act is thus a far cry from the total bans on handgun possession that were struck down by the Supreme Court in *Heller* and *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3047 (2010). As the Court emphasized in *Heller*, such handgun bans "amount[ed] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for th[e] lawful purpose." 554 U.S. at 628; *see id.* at 629 (observing that "the American people have considered the handgun to be the quintessential self-defense weapon"). The SAFE Act does nothing remotely similar.

In addition, a review of rifle permit information conducted by the City before the enactment of the City's 1991 assault-weapons ban revealed that, even before that ban was in place, persons who registered assault weapons almost always owned other, non-assault weapons: the review showed that 1,532 persons in the City who held rifle permits had registered assault rifles, and nearly ninety percent of those individuals had also registered another non-assault rifle in addition to assault rifle.[14] These data further support the conclusion that the SAFE Act does not impose a substantial burden on Second Amendment rights, and thus should be

---

[14] *See* Draft Ltr. to the Hon. Sheldon S. Leffler, Chairman of the Public Safety Committee of the City Council, dated July 15, 1991, at 4-5, *reprinted in* NYLS Bill Jacket for Local Law 78 of 1991.

reviewed under rational basis scrutiny, if it is subject to Second Amendment scrutiny at all.

## 2. The SAFE Act would satisfy heightened scrutiny if it applied.

If heightened scrutiny were applied here (and it should not be), the SAFE Act would pass muster, because the Legislature had ample basis to conclude that the protections of the statute will substantially further the government's compelling interest in ensuring the safety and security of the public.

We will not restate here the impressive body of empirical and other support for the public-safety justification for the SAFE Act that is set forth in the state defendants' brief (at 42-60), but will rather only add information from the City's own experience. When the citywide assault-weapons ban was before the City Council in 1991, the NYPD Office of Legislative Affairs reported that an assault rifle used in the commission of a crime is 35 times more likely to be the instrument of a homicide than the average firearm.[15] The NYPD also reported at that time that semiautomatic handguns capable of accepting clips that held 12 to 30 rounds had rapidly become the weapons of choice for criminal elements and were often being

---

[15] NYPD Legislative Affairs Fax at p. 10, NYLS City Council Bill Jacket for Local Law 78 of 1991; Letter from Police Commissioner Lee P. Brown to Chairman, Public Safety Committee, dated March 25, 1991, NYLS City Council Bill Jacket for Local Law 78 of 1991.

used in association with the drug trade.[16] Perils from high-capacity magazines continue to persist in New York City today: a recent NYPD review showed that over the last fourteen months, the NYPD has seized 1,265 magazines with a capacity exceeding ten rounds, and that 21 of those magazines were seized in arrests for homicides.

The City has observed that a ban on assault weapons and large-capacity magazines helps to reduce crime by making it safer for the police to do their jobs—to execute search warrants and to respond to emerging situations—because police officers are less likely to be outgunned and placed in grave danger. Law enforcement officers are better able to protect the public with assault weapons and large capacity magazine bans in place. The bans also help to provide a legal basis for police disruption of violent crime before it happens, because the illegality of such weapons may provide the basis for reasonable suspicion to stop and question an individual or probable cause to arrest the individual before a violent crime occurs.

It is particularly troubling that plaintiffs rely (Br. at 25-26) on police use of magazines with a capacity greater than ten rounds as if such use were a justification for civilians to possess and use such magazines as well. Their attempt

---

[16] NYPD Legislative Affairs Fax at p. 9, NYLS City Council Bill Jacket for Local Law 78 of 1991; *see id.* at 8 (reporting that the NYPD had seized 98 assault rifles in all of 1989 but had already seized 104 such files in the first half of 1991 alone).

to equate police officers and civilians shows the flawed logic at the core of the challenge to the SAFE Act. Police officers are highly trained and operate under close and centralized supervision, and they are charged by society with the duty to intercede in highly dangerous situations to attempt to resolve and diffuse them.

Civilians stand in sharp contrast. They are highly varied in their degree of experience and training—they may be untrained or only minimally trained in use of the weapons in question—and they are not subject to close and ongoing supervision in their use of weapons, as police officers are. And civilians' need for firearms for defensive purposes cannot reasonably be compared to police officers' need for constant protection when they may be required at any moment to interject themselves into perilous and rapidly developing situations, under conditions of tremendous uncertainty.

Indeed, the record of the NYPD's careful study and deliberation as to the authorization of semiautomatic weapons and higher-capacity magazines on the force only undermines plaintiffs' position here and confirms the validity of the common-sense understanding that the capacity to fire more rounds, more quickly increases the potential for unintended harm, especially in densely populated urban environments. It was not until 1993 that then-Police Commissioner Raymond Kelly authorized the use of semiautomatic weapons by NYPD officers, and this judgment was made only in response to evidence that the police were being

outgunned as a result of the increasing use of semiautomatic weapons by criminals.[17] Commissioner Kelly explained that he approached his decision slowly and deliberately—and after careful testing—because "more was at stake in densely populated New York than in smaller cities."[18] There is no basis for plaintiffs' argument that such careful judgments about the authorization of semiautomatic weapons and high-capacity magazines for police use somehow provides a justification for civilian possession of such weaponry.

For all of these reasons, and for the reasons more thoroughly and fully demonstrated by the state defendants, the SAFE Act would satisfy heightened scrutiny under the Second Amendment, if such scrutiny properly applied. The SAFE Act will only minimally affect persons' ability to act for legitimate purposes of self-defense, if it affects that ability at all, and the Act will substantially advance and protect the safety and security of the public.

---

[17] A. 1382; *see also* January 5, 2005 Public Hearing on Local Laws, at 52-53, NYLS City Council Bill Jacket for Local Law 8 of 2005 (explaining that the City's assault-weapons ban protects the residents and citizens of the City of New York, and ensures that the police officers are not out-armed by drug dealers that have automatic weapons and assault weapons superior to weapons used by police).

[18] A. 1382.

## CONCLUSION

This Court should affirm the district court's judgment insofar as it upheld the constitutionality of the SAFE Act's ban on assault weapons and large-capacity magazines and reverse the court's judgment insofar as it invalidated the Act's seven-round load limit and struck down the provisions concerning muzzle brakes and semiautomatic versions of automatic rifle, shotguns or firearms.

Dated:      New York, New York
August 5, 2014

Respectfully submitted,

ZACHARY W. CARTER
Corporation Counsel of the
  City of New York
Attorney for *Amici Curiae*

By:           /s/
Susan Paulson
Assistant Corporation Counsel

RICHARD DEARING,
SUSAN PAULSON,
   *of Counsel.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because this brief contains 4,505 words, including the parts of the brief

exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

Dated:       New York, New York
             August 5, 2014

ZACHARY W. CARTER
Corporation Counsel of the
  City of New York
Attorney for *Amici Curiae*


By:    _____/s/_____
         Susan Paulson
         Assistant Corporation Counsel